## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19-cr-00204-JAW |
| | ) | |
| MARC J. KARUN | ) | |

### ORDER ON MOTION TO SUPPRESS

Maine State Police obtained a warrant to search the Maine home of a suspect in an unsolved 1986 rape and murder of an eleven-year-old girl in Connecticut for evidence related to the 1986 crime. During the search of the individual's home, police found numerous firearms and then, because the individual was a convicted felon, obtained a separate warrant to search his home for firearms, magazines, ammunition, and evidence of ownership. Now, the individual seeks to suppress the results of that firearms search, arguing that the evidence obtained was the result of a warrant unsupported by probable cause in violation of his Fourth Amendment rights under the United States Constitution. The Court concludes that the warrant was unsupported by probable cause, but because the Court finds the good faith exception applies, the Court denies the motion to suppress.

## I.   BACKGROUND

### A.   Procedural Background

On November 6, 2019, a grand jury returned a one-count indictment against Marc Karun, charging him with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). *Indictment* (ECF No. 1). On December 11, 2019, a grand jury returned a two-count superseding indictment, charging Mr. Karun with

1) possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2), and 2) possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) and § 924(a)(1)(B). *Superseding Indictment* (ECF No. 21). On August 24, 2020, Mr. Karun filed a motion to suppress firearms and ammunition seized by police during a search of his home. *Def.'s Mot. to Suppress Evid. Obtained in Violation of the Fourth Amendment* (ECF No. 41) (*Def.'s Mot.*). On September 14, 2020, the Government responded in opposition. *Gov't's Opp'n to Def.'s Mot. to Suppress* (ECF No. 45) (*Gov't's Opp'n*). The next day, the Government filed additional documents, including the first Maine search warrant and accompanying affidavit and the second Maine search warrant. *Gov't's Additional Attachs.* (ECF No. 46).[1] Mr. Karun replied to the Government on October 12, 2020. *Def.'s Reply to Gov't's Opp'n to Def.'s Mot. to Suppress* (ECF No. 50) (*Def.'s Reply*).

## B. Factual Background

### 1. The Connecticut Search Warrant & the Weisgerber Affidavit

On June 11, 2019 at 9:00 a.m., Lieutenant Arthur Weisgerber of the Norwalk, Connecticut Police Department obtained a warrant from Connecticut State Superior Court Judge White of Stamford, Connecticut for the search of Marc Karun and his home at 76 Coboro Road in Stetson, Maine and the seizure of certain property relating

---

[1]      The Government's attachments are composed of several documents, including the initial Connecticut search warrant, the affidavit accompanying the Connecticut search warrant, and the psychological report prepared by the United States Marshals Service in support of the Connecticut search warrant. For ease of reference, the Court refers to those documents as follows: *June 11 Maine Warrant* (pages 1-6 of ECF No. 46), *Weisgerber Aff.* (pages 7-40 of ECF No. 46), *Conn. Warrant* (pages 41-42 of ECF No. 46), and *Bourke Report* (pages 43-47 of ECF No. 46). The Court refers to the second Maine search warrant as the *June 12 Maine Warrant* (ECF No. 46-1).

to the 1986 rape and murder of Kathleen Flynn in Connecticut. *Conn. Warrant*. The warrant specifically described the following property:

> Ligatures capable of being used to bind and strangle Kathleen Flynn; the gold heart shaped earring of Flynn; the underwear of Flynn; the bra of Flynn; images of the earring, underwear or bra of Kathleen Flynn to include film and digital; newspaper articles/clippings relating to the homicide of Kathleen Flynn or any of the other sexual assaults committed by Marc Karun; electronic devices capable of connecting to the Internet to conduct searches relating to the Kathleen Flynn homicide or any of the other sexual assaults committed by Karun to include Smartphones, Tablets, Laptop computers and Desktop computers; any logs, journals or diaries relating to the sexual assault and homicide of Kathleen Flynn or any of Marc Karun's other sexual assault victims.

*Id.* In support of the warrant, Lieutenant Weisgerber attached his thirty-two page affidavit detailing the investigation of the Flynn murder and recounting Mr. Karun's prior sexual assaults. *Weisgerber Aff.* He also attached a five-page consultation report from the Behavioral Analysis Unit of the United States Marshals Service regarding the taking and saving of "trophies" or memorabilia by serial rapists and serial murderers. *Bourke Report.* Together, these documents provided the basis for the Connecticut State Superior Court judge to find probable cause, which in turn provided the basis for the Maine State District judge to issue the first Maine search warrant, which led to the second Maine search warrant.

### a.    The Flynn Murder

On Tuesday, September 23, 1986, at 5:12 p.m., the Norwalk Police Department received a missing person complaint from a woman reporting that her eleven-year-old daughter, Kathleen Flynn, had not returned home from Ponus Ridge Middle School in Norwalk, Connecticut. *Weisgerber Aff.* ¶ 3. Her daughter normally arrived

home at 3:30 p.m. *Id.* Although the affidavit does not reveal when law enforcement began looking for Ms. Flynn, it states that the Norwalk Police initiated an intensive search in the area of the Ponus Ridge Middle School and concentrated their search between the entrance driveway to the school and the footpath adjacent to the driveway Ms. Flynn regularly used to walk home. *Id.* ¶ 4.

At 2:00 a.m. on Wednesday, September 24, 1986, officers located several articles of clothing and the school bags of Ms. Flynn in the woods. *Id.* The search continued and at approximately 3:35 a.m., officers found Ms. Flynn's half-nude body under a pile of brush and tree limbs. *Id.* Upon removing the sticks and branches, a ligature strangulation mark was easily visible on her neck along with three to four rows of ligature bindings on both wrists. *Id.* ¶ 5. The ligatures used by the perpetrator to strangle Ms. Flynn and bind her wrists had been removed by the perpetrator before he concealed her body. *Id.* Further visual examination of Ms. Flynn's body showed signs of sexual assault based on extensive vaginal bleeding in the front and on her buttocks. *Id.*

A September 24, 1986 autopsy confirmed ligature furrows on Ms. Flynn's neck and her wrists, as well as multiple vaginal lacerations. *Id.* ¶ 6. Physical evidence collected at the autopsy consisted of pulled head hair and pubic hair from Ms. Flynn, hair from the area of Ms. Flynn's genitalia, fingernail scrapings, blood for typing, one earring, a chain and a t-shirt. *Id.* The autopsy report stated that microscopic examination revealed no presence of spermatozoa. *Id.* The cause of death was listed

as asphyxia due to ligature strangulation and the manner of death was ruled a homicide.  *Id.*

During the crime scene search between Wednesday, September 24, 1986 through 12:00 p.m. on Friday, September 26, 1986, officers recovered the remainder of Ms. Flynn's clothing except for her underpants, her jeans, a gold heart earring and any of the ligatures used by the perpetrator.  *Id.* ¶ 8.  Officers conducted a secondary search of the general area using rakes.  *Id.* ¶ 9.  On October 8, 1986 at approximately 12:50 p.m., one of the officers located a pair of jeans about ninety-three feet from where Ms. Flynn's body was discovered.  *Id.*  Ms. Flynn's mother positively identified the jeans as Ms. Flynn's and her mother also turned over a J.C. Penny Junior Hi-Beginner size 30 bra box as the type of bra that Ms. Flynn would have been wearing.  *Id.*  The secondary search was completed on October 24, 1986.  *Id.*  To date, the ligatures, underpants, bra, and gold heart-shaped earring have not been located.  *Id.*

### b.      The Investigation of Marc Karun

During the initial investigation, law enforcement developed Marc Karun as a suspect due to a suspicious vehicle description and his January 27, 1986 arrest for sexual assault in a field near Norwalk Community College.  *Id.* ¶ 10.  In that case, Mr. Karun used ligatures to bind the victim's hands behind her back and he cut the electrical wire off the victim after the assault.  *Id.*  After cutting off the wire, Mr. Karun told the victim in that case that he was going to "hang it up."  *Id.*  The police noted that Mr. Karun did not hang the wire up in the car so the police thought that he "may have been referring to another location as a piece of memorabilia."  *Id.*

On October 9, 1986, a detective went to Mr. Karun's house in Norwalk, Connecticut two miles from the homicide scene to speak with him because of the similar use of ligatures in Mr. Karun's previous arrest, the use of ligatures in Ms. Flynn's homicide, and his proximity to the crime scene. *Id.* ¶ 11. Mr. Karun came out of his home to speak with the detective. *Id.* Mr. Karun stated he was at Ponus Ridge Middle School on Friday, September 19, 1986 around 3:00 p.m. to see some teachers and that he went to the library and spoke with the school librarian. *Id.* He also stated he walked on the wooded footpath—the same footpath where Ms. Flynn's body was found. *Id.* He believed that on September 23, 1986, the day of the murder, he was in town half-heartedly looking for a job because his parents were pressuring him to look for a job. *Id.*

Mr. Karun told the detective that his attorney had telephoned his home a few days after the homicide of Ms. Flynn and told him that police might come to his house to question him about the homicide. *Id.* ¶ 12. He stated he did not know Ms. Flynn and he did not commit the crime. *Id.* The detective described his demeanor as cooperative but very nervous and apprehensive. *Id.*

On October 10, 1986, two detectives went to Ponus Ridge Middle School and contacted two librarians. *Id.* ¶ 13. The librarians stated that they did not know Mr. Karun and on September 19, 1986, they worked in the library until 3:00 p.m. and 4:00 p.m. respectively but did not recall seeing any man fitting Mr. Karun's description enter the library. *Id.* Detectives also contacted the hallway monitor on patrol on September 19, 1986 who stated that she did not see any person fitting

6

Mr. Karun's description in the library or the school.  *Id.*  The detectives also gathered all the teachers in the library to identify the teacher who spoke with Mr. Karun on Friday, September 19, 1986.  *Id.* ¶ 14.  None of the teachers recalled talking to Mr. Karun or seeing him that day.  *Id.*

On October 28, 1986, the detectives went to interview Mr. Karun, who had moved to a different apartment in Norwalk, and asked if he could provide the name of the librarian that he spoke to on Friday, September 19, 1986 at 3:00 p.m. at Ponus Ridge Middle School.  *Id.* ¶ 15.  Mr. Karun stated that he did not know the name, was not sure, and did not wish to speak with the police.  *Id.*  He told the detectives that he would contact his attorney and have the attorney contact them.  *Id.*  He repeated that he did go to the school and visit the librarian and she was sitting behind a desk, but he was either unwilling or unable to provide a description of the librarian to the police.  *Id.*  The affidavit states that "[a]t that time, no further evidence or information linked Marc Karun to the murder of Kathleen Flynn."  *Id.*

### c.    Forensic Evidence

On September 26, 1986, law enforcement submitted the evidence collected from Kathleen Flynn's body at autopsy along with evidence collected at the crime scene to the state of Connecticut Forensic Science Laboratory for examination.  *Id.* ¶ 18.  The Criminalistics Section examined the items for hairs, fibers, blood and seminal stains and on February 19, 1987, it issued a report.  *Id.*  The report concluded that there were numerous hair samples dissimilar to either Kathleen Flynn's hair or

Mr. Karun's hair. *Id.* The report also stated that "microscopical hair comparison do[e]s not serve as a positive means of identification." *Id.*

On January 13, 1989, the Criminalistics Section issued another report based on its microscopic examination of suspect pubic hair and head hair from both Ms. Flynn and Mr. Karun and it found the hairs dissimilar to Mr. Karun's hair. *Id.* ¶ 20.

During the investigation, two other persons of interest were identified besides Marc Karun. *Id.* ¶ 22. One used a ligature during a sexual assault and the other bragged in a bar that he had killed Kathleen Flynn. *Id.* Law enforcement sent samples to the Criminalistics Section of both the other suspects but due to the inadequacies of the samples, no comparisons could be made. *Id.* ¶ 23. Multiple times from 2001 to 2003, law enforcement sent hair and blood samples from Ms. Flynn and the other two persons of interest to Mitotyping Technologies, LLC, a company in State College, Pennsylvania that performs mitochondrial DNA (mtDNA) analysis. *Id.* ¶¶ 24-27. A January 9, 2002 report from Mitotyping Technologies excluded one of the persons of interest as the contributor of all five questioned hairs. *Id.* ¶ 26. A February 27, 2002 report from Mitotyping Technologies excluded the other person of interest as the contributor of four of the hairs and was inconclusive regarding the fifth hair sample. *Id.* ¶ 27.

On June 28, 2002, Lieutenant Weisgerber (then Detective) was assigned to the Norwalk Police Cold Case Unit and assumed responsibility for the Kathleen Flynn

investigation. *Id.* ¶ 28.  Lieutenant Weisgerber ran Mr. Karun's criminal history and found the following record of arrests and convictions:

1) On April 25, 1982, Mr. Karun had been arrested by the DEP for disorderly conduct and was fined $20;[2]

2) On January 27, 1986, the Norwalk Police arrested Mr. Karun and he was charged with Kidnapping 1st Degree and Sexual Assault 1st Degree.   These charges were later substituted down to Sexual Assault 4th Degree;

3) On April 6, 1988, the Derby Police arrested Mr. Karun and he was charged with Kidnapping 1st Degree and Sexual Assault 1st Degree. The prosecution nolle prossed the Kidnapping 1st Degree charge and he was sentenced to 16 years executed after 10 years for Sexual Assault 1st Degree;

4) On May 23, 1988, the Connecticut State Police, Troop G, Bridgeport, arrested Mr. Karun for Unlawful Restraint 1st Degree, Threatening, and Carrying a Dangerous Weapon.  The prosecutor nolle prossed the Unlawful Restraint 1st Degree and Carrying a Dangerous Weapon charges and he received a one-year sentence for the Threatening charge;

---

[2]     The record does not reveal what DEP stands for or any details about the disorderly conduct offense.  It may be that the initials stand for the state of Connecticut Department of Environmental Protection (now known as the Connecticut Department of Energy and Environmental Protection), whose game wardens in 1982 were law enforcement officers.  But this is not confirmed by the record and the details beyond what appears in the record do not affect the Court's decision.

5) On June 17, 1988, the New Canaan Police arrested Mr. Karun and he was charged with Kidnapping 1st Degree and Sexual Assault 1st Degree. The prosecutor nolle prossed the Kidnapping 1st Degree charge and he was sentenced to 16 years executed after 10 years for Sexual Assault 1st Degree;

6) On July 22, 1996, the Weston Police arrested Mr. Karun and he was charged with Burglary 3rd Degree and Larceny 3rd Degree; he was sentenced to two years in jail.

*Id.* ¶ 29. The Connecticut Department of Corrections records confirmed that Mr. Karun had been an inmate from May 23, 1988 to May 24, 1988, from June 20, 1988 to January 11, 1994, from July 23, 1996 to July 24, 1996 and from January 13, 1997 to June 27, 2000. *Id.* ¶ 30.

On March 27, 2003, Lieutenant Weisgerber secured a search and seizure warrant authorizing hairs previously collected in 1988 from Mr. Karun during the execution of a warrant to be analyzed for mtDNA by Mitotyping Technologies. *Id.* ¶ 31. The hairs were in possession of the State of Connecticut Forensic Laboratory and consisted of Mr. Karun's pulled body hair, his pubic hair, his pulled pubic hair, and his pulled head hair. *Id.* On June 24, 2003, Mitotyping Technologies received slides containing the hairs and chose to use the pulled pubic hair sample, which it labelled 2150K4, to develop Mr. Karun's mtDNA profile. *Id.* ¶ 32. On August 18, 2003, Mitotyping Technologies issued a report concerning the comparison of 2150K4 and five unknown hairs found at the crime scene, 2150Q1-2150Q5. *Id.*

The August 18, 2003 report indicated that the mtDNA sequences between 2150K4 (Mr. Karun's pubic hair) and 2150Q5 (pubic hair found on the body of Ms. Flynn) are the same. *Id.* Therefore, Mr. Karun and his maternal relatives were not excluded as contributors of the 2150Q5 unknown hair. *Id.* The report further stated that a search of its current database indicated that the mtDNA profile seen in the 2150Q5 and 2150K4 samples had been previously observed in 146 of 4,839 individuals of North American forensic significance. *Id.* Dr. Melton of Mitotyping Technologies explained that these results meant 97% of the population would be excluded as contributors of the 2150Q5 unknown pubic hair sample and Mr. Karun and his maternal relatives would be among the 3% of population included as contributors.[3] *Id.*

On November 16, 2011, Lieutenant Weisgerber submitted three items of evidence, including fingernail scrapings of Ms. Flynn, a sex crimes kit collected from Mr. Karun during a 1988 search warrant, and debris samples from the hands and feet of Ms. Flynn. *Id.* ¶ 42. There was a matching DNA profile between Mr. Karun and the fingernail scrapings, and on April 25, 2012, the Connecticut Forensic Science Laboratory issued a report concluding that "[t]he expected frequency of individuals who could not be eliminated as a contributor . . . to the [fingernail scraping DNA profiles] is approximately 1 in 1.3 million in the African American population, approximately 1 in 190,000 in the Caucasian population and approximately 1 in 280,000 in the Hispanic population." *Id.* ¶¶ 43-44. Supplemental reports from 2015

---

[3]     This report excluded some of the other hair samples as coming from Mr. Karun. *Weisgerber Aff.* ¶ 32.

and 2017 eliminated two other suspects as the source of any DNA profiles developed from the evidence.  *Id.* ¶¶ 45-46.

On October 3, 2017, Maine State Police executed a warrant to collect buccal swabs from Mr. Karun, and the next day Lieutenant Weisgerber submitted the buccal swabs to the Connecticut Forensic Science Laboratory.  *Id.* ¶¶ 51-53.  On November 22, 2017, the laboratory issued a report comparing the buccal swabs to thirty-one items of evidence, and Mr. Karun was eliminated as the source for twenty-four of the items and found to be inconclusive in five of the other items.  *Id.* ¶¶ 54-56.  The fingernail scrapings were found unsuitable for comparison due to contamination in a control sample.  *Id.*  A forensic science examiner from the Connecticut Forensic Science Laboratory stated that all DNA testing of the evidence had been exhausted.  *Id.* ¶ 57.  *See id.* ¶¶ 58-64 (summarizing results of DNA testing).

### d.    Marc Karun's Prior Assaults

The Weisgerber Affidavit next recounts Mr. Karun's history of sexual assaults, which Lieutenant Weisgerber contends share "noticeable similarities" with the details of the sexual assault and murder of Ms. Flynn, including a similar "Geographical Profile, Modus Operandi, and Rituals."  *Id.* ¶ 69.  Specifically, the Weisgerber Affidavit describes the geographical profile of Mr. Karun's assaults as locations familiar to Mr. Karun and in close proximity to where he resided or stayed as a guest.  *Id.* ¶ 70.  The areas provided him with easy access and the ability to reconnoiter and allow for some degree of control.  *Id.*  The modus operandi included gaining control and compliance of his victims by controlling the victim's neck with a

ligature, knife, or chokehold. *Id.* ¶ 77. He performed common rituals such as using a ligature and removing it before he left the crime scene. *Id.* ¶ 78. The relevant assaults are recounted below.

On January 27, 1986, Mr. Karun drove the victim, an eighteen-year-old female he knew from high school, to the rear of the Norwalk State Technical College approximately 1.6 miles from his home and attempted to get the victim to walk with him towards the woods. *Id.* ¶ 71. When the victim refused, Mr. Karun dragged her towards the woods that led down a ravine to the edge of a river, where he would be out-of-view and where the noise of the river would muffle any sounds. *Id.* He placed a knife to the victim's throat for compliance and then tied her hands behind her back with a ligature he had on his person. *Id.* ¶ 77. He then made the victim perform oral sex while on her knees. *Id.* ¶ 78. Back in the car, he blindfolded the victim, removed her clothing, and forcibly penetrated her. *Id.* After the assault, he told the victim that he was going to take the wire that he used to tie her hands and "hang it up." *Id. See Def.'s Mot.*, Attach. 1, *January 1986 Police Report* (ECF No. 41) (detailing the assault).

On April 15, 1988, Mr. Karun invited a sixteen-year-old female victim to his apartment in Derby, Connecticut. *Id.* ¶ 72. The sixteen-year-old had been at Mr. Karun's apartment the night before, playing cards with another woman. *Id.* When the sixteen-year-old arrived, she expected the other woman would be there too, but she was not. *Id.* Soon after she arrived, Mr. Karun grabbed the victim and put her into a chokehold to gain compliance. *Id.* ¶¶ 72, 77. He tied the victim's hands

behind her back and bound her arms and feet, blindfolded her, and undressed her before sexually assaulting her.  *Id.* ¶ 79.

On May 15, 1988, Mr. Karun moved out of his Derby apartment and a new tenant moved in.  *Id.* ¶ 73.  On the first night at her new apartment, the new tenant— a twenty-three-year-old female—reported that her boyfriend had dropped her off around 1:30 a.m.  *Id.*  Before going to sleep, she checked the deadbolt and door lock on the apartment door and placed a chair against the doorknob since it was her first night sleeping in the apartment.  *Id.*  The victim awoke to find Mr. Karun, who had entered the apartment with keys he kept after he moved, standing over her.  *Id.* Mr. Karun placed his knee on her throat to gain compliance and then placed a ligature around her neck.  *Id.* ¶ 77.  He also tied her hands behind her back, put a pillowcase over her head, gagged her, and removed her clothing before sexually assaulting her.  *Id.* ¶ 80.  Every time the victim struggled, she felt something choking her like a rope or cord around her neck.  *Id.*  He removed the ligatures and gag from the victim prior to leaving the scene, leaving the shoelaces on the victim's wrists.  *Id.* The ligature was not recovered at the crime scene.  *Id.*  This case had previously been unsolved, but Mr. Karun was positively identified as the offender through DNA testing on March 28, 2018.  *Id.* ¶ 73.  *See Def.'s Mot.*, Attach. 2, *May 1988 Police Report* (ECF No. 41) (detailing the assault).

On May 23, 1988 around 4:30 a.m., Mr. Karun was driving in Norwalk when he pulled over to pick up a woman walking along the street.  *Id.* ¶ 74.  Once she was in the vehicle, he abruptly drove onto Interstate 95 at a high rate of speed and at

knifepoint ordered the victim to strip while in the moving vehicle.  *Id.*  The victim was able to steer the vehicle into the grassy median by the rest area in Fairfield, Connecticut to get help.  *Id.*

On June 17, 1988 at 6:40 a.m., Mr. Karun parked his girlfriend's vehicle in the driveway of a home in New Canaan, Connecticut and waited by crouching in the driveway as the forty-one-year-old female victim came walking down the street.  *Id.* ¶ 75.  Mr. Karun stepped out and asked for directions, and then followed the victim as she walked away.  *Id.*  He then grabbed the victim around the neck in a chokehold and attempted to drag the victim at knifepoint to his waiting vehicle.  *Id.*  The attempted abduction was interrupted by two other persons walking in the area and Mr. Karun drove off.  *Id.*

Lieutenant Weisgerber makes the following comparison between Ms. Flynn's assault and murder and the other sexual assaults.  First, based on the fact there was no dirt on Kathleen Flynn's jeans and there was dirt on her knees, the perpetrator removed Ms. Flynn's sneakers, socks, jeans and underwear prior to the sexual assault. *Id.* ¶ 81.  Second, Ms. Flynn's wrists were tied together.  *Id.*  In three sexual assaults, Mr. Karun tied the victims' hands and "none of them had the clothing on their upper body removed since their hands were tied."  *Id.*  Ms. Flynn was similarly found nude from the waist down but still wearing her t-shirt.  *Id.*

### e.   The Bourke Consultation

During Lieutenant Weisgerber's investigation, he contacted Dr. Michael Bourke, Chief of the Behavioral Analysis Unit at the United States Marshals Service

in Washington, D.C. for a case consultation on the "taking and saving of 'trophies' or memorabilia by serial offenders, particularly serial rapists and serial murderers." *Bourke Report* at 1. Lieutenant Weisgerber states that he provided Dr. Bourke with "case documents for case consultation, specifically to the possession of trophies and souvenirs by offenders." *Weisgerber Aff.* ¶ 85. On June 5, 2018, Dr. Bourke issued a case consultation for the Kathleen Flynn homicide and sexual assault. *Id.*

Dr. Bourke's report states that "[a] subset of offenders, including some serial rapists and murderers, take and may keep items that belonged to, were worn by, or are somehow connected to their victims." *Bourke Report* at 1. In particular, offenders who kill in a particularly "intimate" manner, such as strangulation, or murder their victims after sexually assaulting them, are more likely to take an object from the scene to memorialize the act or maintain their connection to the victim. *Id.* at 1-2. Another motivation for taking memorabilia is to relive the act at a later date, which may be the "truest examples of 'souvenirs' or 'trophies.'" *Id.* at 2. The report also states that child molesters and child murderers may also collect souvenirs for the same reasons, although "not all child murderers are pedophiles, and not all take mementos from their crimes." *Id.* at 3-4.

The report concludes that "[i]ndividuals who commit crimes in which there exists an inherent or perceived intimate connection with the victim – such as rape of an adult, sexual assault of a child, or murder – may feel the need to take an object from the crime scene." *Id.* at 4. While the specific motivations may differ from one offender to the next, in general, "the goal is to prolong or re-experience sexual

excitement, maintain feelings of accomplishment or power, or otherwise 'extend the fantasy.'"  *Id.*  The report instructs investigators not only to pay attention to items found at the crime scene but also to look for what items might be missing because "[i]f the victim is missing a piece of jewelry or an article of clothing, for example, there is a definite possibility the perpetrator removed that item purposefully."  *Id.*  If such an item is missing, "there is a strong likelihood he will keep that item for an extended period of time."  *Id.*  Therefore, the report advises it is "extremely important" to look for these types of items "in the property of suspects (e.g., during the execution of any search warrant)."  *Id.*

### 2.  The Maine Search Warrants

On June 11, 2019 at 4:10 p.m., Detective Thomas Pickering—a law enforcement officer for the Maine State Police, Piscataquis County who had been assigned to assist the Norwalk Police Department with the unsolved homicide of Kathleen Flynn—obtained a search warrant from a Maine State District Court judge for the search of Marc Karun and his home at 76 Coboro Road in Stetson, Maine and the seizure of certain property relating to the 1986 rape and murder of Kathleen Flynn in Connecticut.  *June 11 Maine Warrant.*  The description of the property or persons to be seized was nearly identical to the Connecticut Warrant, the only difference being the inclusion of the names of Mr. Karun's past sexual assault victims. *Id.* at 2.

In support of his application for the warrant, Detective Pickering reviewed and attached for the judge's consideration the Connecticut Warrant, the Weisgerber

Affidavit, and the Bourke Report. *Id.* at 5. Detective Pickering swore "upon information and belief, that all of the information contained within th[e] search warrant affidavit and request, is both truthful and accurate." *Id.* at 6.

The next day, following a search of Mr. Karun's residence, Detective Pickering applied for another search warrant. *June 12 Maine Warrant*. In the application, Detective Pickering stated that he learned during the execution of the June 11 search warrant that multiple firearms were located by Maine State Police searchers inside Mr. Karun's residence. *Id.* at 5. Detective Pickering explained that he saw what appeared to be a scoped .22 caliber semiautomatic rifle leaning against a wall near the front main entrance to the residence, and other searchers advised him that multiple other firearms were located inside the residence. *Id.* Detective Pickering stated that he believed Mr. Karun was a convicted felon and unlawfully in possession of firearms. *Id.*

On June 12, 2019 at 7:05 p.m., a Maine State District Court judge issued a second search warrant, authorizing the search of Mr. Karun's Stetson residence and his car for "[a]ny firearm, magazines, ammunition, evidence of ownership of firearms and ammunition." *Id.* at 2. The warrant listed the "reason for seizure" as "property that constitutes evidence of the commission of a criminal offense, namely Possession of a Firearm by Prohibited Persons." *Id.* The Government and Mr. Karun agree that law enforcement execution of this warrant found a substantial number of firearms.

18

## II.    POSITIONS OF THE PARTIES

### A.    Marc Karun's Motion

Mr. Karun moves pursuant to Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h) to "suppress all evidence and any fruits thereof obtained by the Government as the result of a search of [Mr. Karun's] home authorized by a warrant unsupported by probable cause and otherwise in violation of the Fourth Amendment to the United States Constitution." *Def.'s Mot.* at 1.  He contends that to be valid, the affidavit must establish probable cause for at least four inferences: (1) "Mr. Karun killed Ms. Flynn with ligatures"; (2) "he intentionally retained the ligatures and some of Ms. Flynn's clothing and took those objects from the scene"; (3) "he did so because he regarded those objects as trophies"; and (4) "he chose and was able to safeguard these items for the next 33 years, despite spending six years in prison beginning in 1988 and three years in prison beginning in 1997, and despite having changed his residence at least six times between September of 1986 and June of 2019." *Id.* at 19-20.  He also contends that the proposition that his home contained various media relating to Ms. Flynn's death relies on a similar set of inferences. *Id.* at 20.  Because the affidavit did not establish probable cause for these inferences, he argues the warrant was invalid and the search unconstitutional.

Addressing the first premise, Mr. Karun argues there is insufficient evidence to find probable cause that he killed Ms. Flynn. *Id.*  He analyzes the forensic evidence and states that "[t]aken as a whole, the forensic evidence suggests that the relevant DNA comparisons are inconclusive." *Id.*  He argues that the evidence is at best

"inconclusive" and therefore "[t]he evidence presented in the affidavit on this issue is . . . arguably insufficient for probable cause." *Id.* at 22 (citing *Valente v. Wallace*, 332 F.3d 30 (1st Cir. 2003)).

He next turns to the evidence implying that he took trophies from Ms. Flynn and others. *Id.* at 23. He claims that the affidavit "cannot establish the identity of the object used to strangle Ms. Flynn," "the fact that the police did not find [the ligature] does not establish that the perpetrator consciously retained it," and "even if the perpetrator consciously removed the object from the scene, it does not follow that he did so because he considered it a trophy." *Id.* at 23-24. He argues that his prior convictions do not establish that he belongs to a subset of offenders who collect and retain objects associated with their victims, as there is no evidence of what he did with the ligatures after his assaults and his alleged statement from the January 1986 assault that he was going to "hang it up" does not establish that he viewed the ligature as a trophy. *Id.* at 24-25. He also claims that "[t]he analysis of Mr. Karun's use of ligatures in other cases does not establish that he belongs to the subset of offenders who take and keep 'trophies' or 'souvenirs' from their victims." *Id.* at 26. Specifically, the Bourke Report was not written with the facts of Mr. Karun's case in mind and "does not provide the type of information needed to support a reasoned conclusion that Mr. Karun belongs to the class of offenders who take and keep trophies associated with their victims." *Id.* at 28 (citing *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990)).

Mr. Karun takes issue with the implication that he is a collector of pornographic media consistent with pedophilia because the affidavit does not establish that he is a pedophile and there is no evidence to suggest that the media described in the affidavit exists. *Id.* at 28-31. Therefore, he argues that the warrant is "overbroad" and "not justified by the probable cause on which it is based, and lacking nexus between object, crime, and place." *Id.* at 31.

Mr. Karun next argues that the evidence implying that he took trophies from Ms. Flynn is stale because thirty-three years separated the search from the time of Ms. Flynn's death and Mr. Karun changed his residence six times since then. *Id.* at 32-33. He says that "[w]ithout more recent corroboration, the passage of 33 years irreversibly diminished the probability that evidence of Ms. Flynn's death would be found at the home of Mr. Karun." *Id.* at 35.

Mr. Karun contends that the descriptions of the items associated with Ms. Flynn—specifically "ligatures *capable of being used* to bind and strangle Kathleen Flynn; the gold heart shaped earring *of Flynn*; the underwear *of Flynn*; [and] the bra *of Flynn*"—were not sufficiently particular. *Id.* (emphasis in original). "Because the search warrant authorized seizure of property with no identifiable evidentiary value, it was so imprecise as to be 'general' and was therefore invalid." *Id.* at 37.

Finally, Mr. Karun argues that the affidavit contains misleading statements material to probable cause. *Id.* He argues that the conclusion in the Weisgerber Affidavit that "[Mr.] Karun did not hang the wire up in the car so he may have been

referring to another location as a piece of memorabilia" was "speculative" and presented with reckless disregard for the truth. *Id.* He also points to paragraph seventy-seven of the Weisgerber Affidavit which states that "[Mr.] Karun removed the neck ligature from the victim [of the May 1988 Derby attack] prior to leaving the scene and took it with him." *Id.* at 38. He claims that statement was a statement of fact made with reckless disregard for the truth and contends that a "veracity hearing" pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is warranted. *Id. See id.* at 19.

**B.    The Government's Response**

The Government responded in opposition, addressing each of Mr. Karun's arguments. The Government makes six assertions: (1) "the search warrant was issued on probable cause"; (2) "the property to be seized was described with particularity"; (3) "the warrant properly provides for seizing documentary evidence, including electronically stored"; (4) "the information in the affidavit was not stale in light of the character of the evidence sought"; (5) "the police could rely on the warrant in good faith"; and (6) "the statements concerning the 1986 and 1988 sexual assaults are neither false nor misleading." *Gov't's Opp'n* at 10-24.

The Government claims the warrant provided "ample" basis for a finding of probable cause because the affidavit gives probable cause to believe that Mr. Karun was involved in the rape and homicide of Ms. Flynn, that he is a serial rapist who choked and strangled his young victims, that he was an offender of the type prone to keep mementos and keepsakes from the crimes, and such mementos could include evidence bearing on the Flynn case or other sexual assaults committed by Mr. Karun.

*Id.* at 11-12.   The Government points to Mr. Karun's presence in the immediate vicinity of the murder, his inconsistent story, lack of alibi and similar prior acts.   *Id.* at 12-14.   While the DNA evidence does not definitively identify Mr. Karun, it provided the Connecticut and Maine judges "ample" probable cause that Mr. Karun raped and murdered Ms. Flynn.   *Id.* at 14-15.   The Bourke Report "describe[es] in detail a substantial basis on which the judge issuing the warrant could determine that Marc Karun was, in fact, not just a serial rapist, but a serial rapist who used similar techniques in each of his attacks," and additionally the affidavit describes the evidence showing that it is possible that memorabilia was taken from the crime scenes.   *Id.* at 16.

Regarding particularity, the Government argues that there is "no reasonable basis to believe that investigators could have confused the undergarments belonging to [Ms.] Flynn with any other undergarments one might reasonably expect to find at the residence."   *Id.* at 17.   The warrant only specified the clothing belonging to Ms. Flynn and the Weisgerber Affidavit specifically described Ms. Flynn's pant size, bra style and size, and the diameter of the ligature marks.   *Id.* at 18.   Even if the Court were to find lack of particularity, the Government contends the issue would not invalidate the entire warrant and the ensuing execution would not generate any "fruit of the poisonous tree."   *Id.*

The Government also contends that the portion of the warrant authorizing the seizure of documentary and electronically stored evidence was proper because there was probable cause to believe these items would be found in Mr. Karun's home.   *Id.*

at 19.  The seizure "was not of electronics in general, but electronics that might contain the type of documentary evidence described in the warrant" and the devices described are "likely to contain the types of digital photographs of the 'trophies' or even the journal entries also specified in the warrant."  *Id.*

The Government next argues that the information in the affidavit was not stale in light of the character of the evidence sought.  *Id.* at 20.  The Bourke Report was based on a character trait common to a smaller set of offenders—serial rapists—who have a special connection to their victims and treasure keepsakes from the encounters.  *Id.* at 21.  Therefore, "[i]t does not strain credulity to believe that a person could maintain possession of such items through several moves and even through stints in prison, just as one might maintain ownership of a high school yearbook or favored childhood souvenir."  *Id.*

Even if the Court deems the affidavit technically insufficient, the Government contends that the police appropriately relied on it in good faith.  *Id.* at 22.  The Government claims that the situation here "was not a fast-and-loose attempt to slip one by the magistrate" but rather was "a lengthy and deliberate statement of the evidence, including the lack of evidence on certain points."  *Id.*

Finally, the Government claims that neither statement identified by Mr. Karun is false or misleading but rather is the product of "reasonable inference."  *Id.* at 23.  A *Franks* hearing would be inappropriate because even if the statements were false, the omission of either statement would not materially affect the warrant

because "the inferences would remain available for the facts stated elsewhere in the affidavit." *Id.* at 24.

### C. Marc Karun's Reply

Mr. Karun repeats his request that the Court suppress the evidence as obtained by a warrant unsupported by probable cause and otherwise in violation of the Fourth Amendment and replies to several of the Government's contentions. *Def.'s Reply* at 1. First, Mr. Karun agrees with the Government's summarization of the Weisgerber Affidavit's description of the search for Ms. Flynn, but argues "[t]he fact that police did not find the gold earring, ligatures, bra, and underwear in the wooded area does not generate a significant probability that the perpetrator consciously removed these items from the scene." *Id.* at 2. He also claims the Government repackaged the forensic evidence in an incriminating light. *Id.* at 2-3.

Mr. Karun disputes the Government's description of the Bourke Report, arguing the relevant class of offender in the report is not "serial rapists" but "trophy collectors" and the Government must establish that Mr. Karun is not simply a serial rapist but "a member of the 'subset of offenders, including some serial rapists and murderers' who 'take and may keep' objects associated with their victims." *Id.* at 3. He compares the Bourke Report to the affidavit in *Weber* and concludes that the Bourke Report "is a non-specific analysis designed to meet all law enforcement needs." *Id.* at 4-6.

Regarding particularity, Mr. Karun notes that the affidavit contained specific descriptions of the evidence, but the warrant provided no guidance to the executing

officers in their efforts to identify objects that were evidence of crime.  *Id.* at 6.  There is no evidence that the affidavit accompanied the search warrant when it was executed by Maine State police officers or that the police narrowed their search based on the information contained in the affidavit.  *Id.* at 8-9 (citing *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977)).

Mr. Karun repeats his claims that the warrant application is devoid of actual information about the existence and location of hypothetical media.  *Id.* at 11.  He contends "the affidavit contains no evidence that film or digital images of Kathleen Flynn's bra, underwear, and earring have ever existed, much less that they were present in Mr. Karun's home in 2019" and there is "no evidence that he ever possessed in any location logs, journals, or diaries relating to [his] offenses."  *Id.*

Mr. Karun next addresses "staleness," but argues such an inquiry is only appropriate where there once existed a demonstrable nexus between object and place.  *Id.* at 12.  Here, he claims this is a case where there has never been any evidence that he ever possessed contraband in the place to be searched and the belief that he continuously possessed the ligatures, bra, underwear, and earring over three decades is "entirely conjectural."  *Id.* at 13.  Even if the warrant application included the "essential ingredient of object-place nexus," it would still fail due to an "unprecedented degree of staleness."  *Id.* at 14.

Finally, Mr. Karun addresses the Government's good faith argument.  *Id.*  Mr. Karun likens the warrant application to the one in *Weber* and argues that "neither provided even 'a conclusory recital' that the defendant's conduct placed him

26

in the relevant class of offender, neither was tailored to what the expert knew about the defendant, and both were 'boilerplate recitations designed to meet all law enforcement needs.'" *Id.* at 15. The warrant application also included "both misleading statements of fact and descriptions of property that fail to satisfy the requirement of particularity" and was "so factually deficient that it failed to particularize . . . the things to be seized." *Id.* at 17. Therefore, "[t]he good faith exception frustrates the purpose of the exclusionary rule in the case of Mr. Karun and this Court should not apply it." *Id.*

## III.   DISCUSSION

### A.   Particularity

#### 1.   Marc Karun's Argument

Mr. Karun argues that the search warrant's description of items to be seized was not set forth with sufficient particularity. *Def.'s Mot.* at 35-36. Specifically, he contends that the "general descriptions of a bra, earring, and pair of underwear provide no basis to differentiate evidence of crime from ordinary property." *Id.* at 36. "Because the search warrant authorized seizure of property with no identifiable evidentiary value, it was so imprecise as to be 'general' and was therefore invalid." *Id.* at 37.

#### 2.   Legal Standard

Under the Fourth Amendment, a warrant must describe items to be seized with sufficient particularity. *United States v. Morris*, 977 F.2d 677, 681 (1st Cir. 1992). The United States Supreme Court has explained that this requirement

"prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). "The manifest purpose of the particularity requirement of the Fourth Amendment is to prevent wide-ranging general searches by the police." *United States v. Bonner*, 808 F.2d 864, 866 (1st Cir. 1986).

The First Circuit has explained a valid warrant: "(1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013). "Where a warrant is accompanied by an affidavit, the 'affidavit may be referred to for purposes of providing particularity,' provided that 'the warrant uses suitable words of reference which incorporate the affidavit.'" *United States v. Tiem Trinh*, 665 F.3d 1, 15 (1st Cir. 2011) (quoting *United States v. Klein*, 565 F.2d 183, 186 n.3 (1st Cir. 1977)). Search warrants and affidavits "should be considered in a common sense manner, and hypertechnical readings should be avoided." *Bonner*, 808 F.2d at 868.

### 3.    Ligatures

Mr. Karun takes issue with the following descriptions: "[l]igatures capable of being used to bind and strangle Kathleen Flynn; the gold heart shaped earring of Flynn; the underwear of Flynn; the bra of Flynn." *June 11 Maine Warrant* at 2.

28

A "ligature" is defined as "something that is used to bind." *Ligature*, MERIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/ligature (last visited Jan. 21, 2021). Read in a hypertechnical way, it is possible that the warrant could permit, as Mr. Karun suggests, the seizure of "virtually any shoelace, rope, or cord present in Mr. Karun's residence." *Def.'s Mot.* at 36. Mr. Karun's point is not without some force. By a broad definition, a ligature could include simple twine, wire used to hang pictures such as braided galvanized steel wire, shoelaces, clothesline, electrical wire, computer cable, and other similar items found in many homes.

The Court, however, notes that the description is limited to ligatures used in the commission of a crime—namely, the binding and strangulation of Kathleen Flynn. Thus, although not expressly limited in the description of the property to be seized, the Court interprets the search warrant to be limited to ligatures roughly thirty years old and capable of tying the hands and strangling an eleven-year-old girl. The Court concludes this description is sufficiently particular for a searching officer to know what to search for and seize and what not to search for and seize. Courts have approved descriptions of items by reference to the criminal conduct in which they have been used. *See Tiem Trinh*, 665 F.3d at 15-16 (concluding "paraphernalia for the packaging, weighing, processing and distributing of marijuana, including scales, plastic bags and utensils" to be sufficiently particular and authorized the seizure of "plant-growing chemicals, planters, fertilizer, and soil"); *United States v. Finnigin*, 113 F.3d 1182, 1187 (10th Cir. 1997) (finding a description of "any and all

unlawful explosives, components or materials thereof" and "any equipment capable of use for the manufacture or assembly of said unlawful explosive devices" was sufficiently particular).

The Weisgerber Affidavit, which the warrant incorporated, further supports the Court's conclusion. The second sentence of the June 11 Maine Warrant references the Pickering Affidavit, consisting of the Connecticut Warrant, the Weisgerber Affidavit, and the Bourke Report, which "accompanies this search warrant and will be filed with this search warrant in the District Court." *June 11 Maine Warrant* at 1. This statement is sufficient to incorporate these documents. *See Rivera Rodríguez v. Beninato*, 469 F.3d 1, 5 (1st Cir. 2006) (concluding "[s]ee attached affidavit" is language sufficient to incorporate an affidavit). The Weisgerber Affidavit also details the number and exact size of the ligature marks on Ms. Flynn's body. *Weisgerber Aff.* ¶¶ 6, 19. This information provides further support to help the searching officers limit their search to locate particular ligatures.

### 4. The Gold Heart-Shaped Earring, Underwear and Bra

Mr. Karun also argues the descriptions of the gold heart-shaped earring, bra, and underwear of Ms. Flynn "are simply categories of mass-produced consumer goods often found in homes" and "the general descriptions of a bra, earring, and pair of underwear provide no basis to differentiate evidence of crime from ordinary property." *Def.'s Mot.* at 36. The Court disagrees. The warrant specifically limits the earring, bra, and underwear as belonging to eleven-year-old Kathleen Flynn. From the record, it appears Mr. Karun is a fifty-four-year-old man. Without further

information about his living arrangements, it is highly unlikely that an eleven-year-old girl's earring, bra, or underwear would be "ordinary property" within his home. For good measure, the Weisgerber Affidavit also describes the bra as a "J.C. Penny Junior Hi-Beginner size 30 bra" and states she wore "size 12 Juniors" jeans. *Weisgerber Aff.* ¶ 9.

The Court thus agrees with the Government that there is "no reasonable basis to believe that investigators could have confused the undergarments belonging to Flynn with any other undergarments one might reasonably expect to find at the residence." *Gov't's Opp'n* at 17. The Court concludes that the descriptions in the warrant provide enough information for a searching officer to know what to seize and is not too broad as to include items that should not be seized, and thus is sufficiently particular.

### B. Probable Cause

Mr. Karun next argues that the search warrant was invalid because the warrant application—including the Weisgerber Affidavit and the Bourke Report—failed to establish probable cause that evidence of a 1986 Connecticut murder would be found in 2019 at his Stetson, Maine residence. *Def.'s Mot.* at 1. Because the execution of this unconstitutional warrant led to discovery of firearms and subsequent execution of the second Maine warrant, Mr. Karun argues evidence of the firearms should be suppressed as fruits of an unconstitutional search in violation of his Fourth Amendment rights. *Id.*

31

### 1.    Legal Standard

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This means "a warrant authorizing the search of property cannot issue except upon a showing of probable cause." *United States v. Adams*, 971 F.3d 22, 27 (1st Cir. 2020). Physical entry into the home, in particular, is "the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (citing *United States v. United States Dist. Court. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)).

"Probable cause exists whenever the circumstances alleged in a supporting affidavit, viewed as a whole and from an objective vantage, suggest a 'fair probability' that evidence of a crime will be found in the place to be searched." *United States v. Clark*, 685 F.3d 72, 76 (1st Cir. 2012) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause does not require either certainty or an unusually high degree of assurance" but rather a "'reasonable likelihood' that incriminating evidence will turn up during a proposed search." *Id.* (internal citations omitted). "Probability is the touchstone." *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999) (quoting *United States v. Khounsavanh*, 113 F.3d 279 (1st Cir. 1997)).

Probable cause can be based on "either direct or circumstantial evidence or some combination of the two." *Adams*, 971 F.3d at 32.  In reviewing a supporting affidavit, the affidavit "should be read 'in its entirety, giving significance to each

relevant piece of information' and should not be judged in 'bits and pieces of information in isolation.'" *United States v. Cochrane*, 896 F.2d 635, 637 (1st Cir. 1990) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 732 (1984)).  A supporting affidavit "need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." *Adams*, 971 F.3d at 32 (citing *Florida v. Harris*, 568 U.S. 237, 244 (2013)).  "What matters, in the long run, is whether the issuing magistrate had a 'substantial basis' for finding that probable cause was extant." *United States v. Nocella*, 849 F.2d 33, 39 (1st Cir. 1988) (citing *Gates*, 462 U.S. at 238-39).

### 2.   Physical Items

The June 11 Maine Warrant describes the following pieces of physical evidence to be seized from Mr. Karun's Stetson residence:

> Ligatures capable of being used to bind and strangle Kathleen Flynn; the gold heart shaped earring of Flynn; the underwear of Flynn; the bra of Flynn . . ..

*June 11 Maine Warrant* at 2.  The Court agrees with Mr. Karun that establishment of a "reasonable likelihood" or "fair probability" that these items existed in Mr. Karun's home required the warrant-issuing judge to follow a chain of inferences. The warrant applicant needed to show (1) reasonable probability that Mr. Karun murdered eleven-year-old Kathleen Flynn in 1986, (2) that he took the described objects with him, and (3) that he chose and was able to keep those items for the next thirty-three years, despite spending six years in prison beginning in 1988 and three years in prison beginning in 1997, and despite having moved at least six times

between September 1986 and June 2019.  With each successive link in the chain, the assumptions compound on each other and the conclusion that the items existed in Mr. Karun's home becomes less and less likely.  The result is a collection of inferences and assumptions that fails to stand up to constitutional scrutiny.

> ### a.  The Kidnapping, Sexual Assault and Murder of Kathleen Flynn

This Court's task is not to decide beyond a reasonable doubt whether Mr. Karun kidnapped, sexually assaulted, and murdered Kathleen Flynn. Kidnapping and murder charges are currently pending in Connecticut and it is the task of a factfinder in Connecticut to determine whether the State is able to prove those charges beyond a reasonable doubt.  Rather, the Court's first duty is to determine whether the submitted documentation provided the issuing magistrates with probable cause to find that he committed these crimes against Kathleen Flynn. Based on this record, the Court readily concludes probable cause existed to find that Mr. Karun in fact kidnapped, sexually assaulted and murdered Kathleen Flynn.

The majority of the Weisgerber Affidavit is spent laying out the investigation and evidence against Mr. Karun.  On the day of the crime, the evidence puts Mr. Karun nearby the crime scene with no alibi.  Mr. Karun had himself attended the Ponus Ridge Middle School and stated he had visited the school a few days before, but no teachers could corroborate his story.  The forensic evidence is somewhat inconclusive, but mtDNA analysis from Mitotyping Technologies showed that Mr. Karun and his maternal relatives are among the 3% of the population that would be included as a contributor to a pubic hair sample found at the crime scene.  Analysis

of DNA profiles from a fingernail scraping sample reveal that Mr. Karun was part of the 1 in 190,000 in the Caucasian population who could not be eliminated as a contributor. Mr. Karun also has a history of sexual assaults using similar modus operandi, such as use of ligatures on the neck and wrists, and he committed several sexual assaults around the same time.

Mr. Karun has not been convicted of the Flynn sexual assault and murder, but he has recently been charged with her kidnapping and murder in Connecticut State court. The Pretrial Services Report in this case dated November 20, 2019 confirms that on June 14, 2019, state of Connecticut authorities arrested Mr. Karun and he was charged with Capital Murder and Kidnapping in the First Degree in the state of Connecticut. *Pretrial Services Report* at 1, 3 (ECF No. 9) (*Pretrial Services Report*). The date of the offense is September 23, 1986. *Id.* Mr. Karun is currently in the custody of the state of Connecticut. *Conditional Order of Detention* (ECF No. 19). The fact that Connecticut later brought criminal charges for the kidnapping and murder of Kathleen Flynn does not affect this Court's review of the magistrates' probable cause determination because it was not information they could have had when they made their determinations. The Court notes that its review is consistent with the later decision of the state of Connecticut to charge Mr. Karun with the kidnapping and murder of Kathleen Flynn.

### b.  The Taking of the Described Items

Assuming there is probable cause to believe Mr. Karun raped and murdered Ms. Flynn, it is unclear whether Mr. Karun took with him the ligatures he used to

bind Ms. Flynn, along with her earring, bra, and underwear. The evidence shows that these items were never recovered from the crime scene, but there is no direct evidence that Mr. Karun took these items. From September 24, 1986 to October 24, 1986, police conducted a search of the wooded area where Ms. Flynn's body was found, using rakes to clear leaves and debris. Some of the items were spread out. For example, it took police about a week to find Ms. Flynn's jeans about ninety-three feet from where her body was discovered. Although Mr. Karun may have taken these items with him, it is also possible that the ligatures, earring, bra and underwear were there but not found or were there for a short while and taken or moved by someone or something else.

Furthermore, regarding Kathleen Flynn's clothing, there is simply no evidence that Mr. Karun took clothing from any of his prior victims. The Court could find no mention of Mr. Karun taking the victims' clothes in the 1986 Norwalk, the April 1988 Derby, or the May 1988 Derby assaults. The victims in those assaults each describe Mr. Karun removing their clothing, but there is no mention in the records before the Court that he took any of their clothing with him. Mr. Karun did not get to the point in the other attempted assaults—the May 1988 Norwalk and June 1988 New Canaan incidents—where the victims removed their clothing. Thus, there is no evidence in the record before the Court that Mr. Karun took his victims' clothing away from the crime scene of his prior or subsequent sexual assaults.

Moreover, Lieutenant Weisgerber makes the point that Mr. Karun had not removed the upper body clothing of his victims because their hands were tied, and

that Kathleen Flynn still had her t-shirt on.  However, the search warrant is seeking Kathleen Flynn's bra, which indicates that in her case, as opposed to all the others, Mr. Karun removed a piece of Kathleen Flynn's upper clothing.  Based on the record before it, the Court views as unsupported the inference that Mr. Karun took Kathleen Flynn's clothing because he had done the same in prior or subsequent assaults and as equivocal that he took Kathleen Flynn's clothing at all.

The evidence that he took ligatures is stronger but not compelling.  In his first sexual assault in 1986 in Norwalk, Mr. Karun cut the wire tying the victim's hands and told her that he was going to "hang it up."[4]  This is the most significant evidence that Mr. Karun retained ligatures as mementos.  Mr. Karun tied up the victim in the April 1988 Derby assault but there is nothing in the record that establishes what he did with the ligatures after the assault.  In the May 1988 Derby assault, Mr. Karun used ligatures in two ways.  First, he placed a ligature around the victim's neck and compelled her submission by tightening it.  Lieutenant Weisgerber says that the police did not locate this ligature on the scene.  The Court can properly infer that Mr. Karun brought it to the apartment and took it with him.  Mr. Karun used a second ligature, white shoelaces that he removed from the victim's sneakers, to tie the victim's hands behind her back.  Mr. Karun left the shoelaces on the victim and, in fact, after the assault, the shoelaces had to be cut from her hands because they had

---

[4]     This is an odd phrase.  Without any other sensible explanation, the Court accepts Lieutenant Weisgerber's view that Mr. Karun was telling the victim that he was going to hang the wire up as a memento of the 1986 Norwalk sexual assault.

been tied so tightly.  Accordingly, he retained the ligature that he used around the victim's neck but left the ligature he used to tie her hands.

There is no evidence in the record that Mr. Karun used a ligature in either the May 1988 Norwalk assault or the June 1988 New Canaan assault.  The record shows that in May 1988, while in his motor vehicle, he threatened a victim with a knife, but she steered the vehicle into the median strip and escaped, and in June 1988, he used a chokehold, but not a ligature.

Based on Lieutenant Weisgerber's search warrant affidavit and the documents the parties placed before the Court, the Court finds that Mr. Karun committed five sexual assaults or attempted sexual assaults between January 1986 and June 1988, that he used a ligature in three of those assaults, that he took the ligature with him in two of those assaults, and in one assault, referring to the ligature, he said he was going to "hang it up."

### c.      Possession of the Items Thirty-Three Years Later

Accepting that there was probable cause that Mr. Karun murdered Kathleen Flynn and took the ligatures and, though less likely, items of her clothing with him, the warrant application next asks the warrant-issuing judge to find probable cause that Mr. Karun kept these items for more than thirty-three years during which he

made at least six moves[5] and served four stints in prison.[6]  In support of this inference, the Government relies on the Bourke Report's conclusion that a subset of serial rapists and murderers keep trophies and memorabilia of their crimes.  *See Gov't's Opp'n* at 15-17.  This conclusion is important because without it, the judge issuing the warrant would not have any reason to believe Mr. Karun, assuming he took the items, would keep them for all these years.  Indeed, it would seem much more common for criminals to destroy or dispose of evidence that could inculpate or corroborate their commission of crimes.  Even if the Court accepts, which it has, the view that Mr. Karun's comment to the victim of his January 1986 assault—that he would hang up the wire that he used to bind the victim's hands—indicated his intent to keep the wire as a memento, without some further evidence, it would be a stretch

---

[5]      Defense counsel makes this six-move assertion without citation.  *Def.'s Mot.* at 20.  The Court is not sure where defense counsel came up with this number, but it seems conservative.

The Weisgerber Affidavit reveals at least four of these moves.  As of September 23, 1986, Mr. Karun lived on Princess Pine Road in Norwalk, Connecticut.  *Weisgerber Aff.* ¶ 10.  By October 28, 1986, Mr. Karun had moved to West Cedar Street, Norwalk, Connecticut.  *Id.* ¶ 15.  As of May 15, 1988, Mr. Karun had just moved out of 50 Bank Street, Apartment 302, Derby, Connecticut.  *Def.'s Mot.*, Attach. 2, *May 1988 Police Report* (ECF No. 41); *Weisgerber Aff.* ¶ 72.  By June 11, 2019, Mr. Karun was living at 76 Coboro Road in Stetson, Maine.  *June 11 Maine Warrant* at 1-2.

Three other arrests suggest, but do not establish, that Mr. Karun was living in other Connecticut towns or cities between September 1986 and June 2019.  In May 1988, he was arrested by the Connecticut State Police located in Bridgeport; in June 1988, he was arrested by the New Canaan, Connecticut Police; and in July 1996, Weston, Connecticut Police arrested him.  *Weisgerber Aff.* ¶ 29.  In paragraph seventy of the Weisgerber affidavit, Lieutenant Weisgerber says that Mr. Karun committed assaults near places where he lived or stayed as a guest.  *Id.* ¶ 70.  If so, then Mr. Karun must have moved more than six times in thirty-three years.  Of course, if the stints in prison are considered as moves, he exceeded six moves during this period.

Finally, one reason the six-move assertion seems conservative is that Mr. Karun intermittently spent so much time in jail during this same interval and it seems unlikely—though possible—that after spending years in jail, he would return to the same residence he left when he went into prison.

[6]      As listed above, the four stints in prison are: (1) May 23, 1988 to May 24, 1988, (2) June 20, 1988 to January 11, 1994, (3) July 23, 1996 to July 24, 1996 and (4) January 13, 1997 to June 27, 2000.  *Weisgerber Aff.* ¶ 30.

to find probable cause that he would likely still have the same wire thirty-three years later.

There are at least a couple of ways this thirty-three-year gap could be crossed. One would be some evidence in his prior encounters with law enforcement that he had retained such mementos. But there is no such direct evidence here.[7] This leaves the only other potential link between his prior crimes and his Maine residence to be an expert report, which could supply a basis for bridging the temporal gap. The Bourke Report is the only expert report in this record that attempts to do so. Thus, apart from Mr. Karun's odd comment in January 1986, the Bourke Report is the sole source for the inference that if Mr. Karun took and kept items as trophies in 1986, he might still have them more than three decades later.

Both parties cite the Ninth Circuit case, *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990), which states that "[i]t is well established that expert opinion may be presented in a search warrant affidavit." *Id.* at 1345. However, "if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class." *Id.*

---

[7]      The Court found that the odd comment about hanging up the ligature at the end of the 1986 sexual assault in Norwalk was consistent with Mr. Karun removing the ligature from the crime scene and hanging it up to admire it or to remind him of his sexual assault. What the Court is discussing here is the absence of any direct evidence that he continued to keep this ligature or any other sought-after evidence of his crimes for extended periods of time, here over three decades.

As is indicated in his criminal record, Mr. Karun had multiple encounters with law enforcement. Based on this record, law enforcement may well have conducted personal searches of Mr. Karun and of his residence over the years and during those searches, if they had come upon an eleven-year-old girl's underwear, no doubt it would have drawn their attention. But there is no direct evidence over the decades that any incriminating evidence of a type consistent with memorabilia was ever located despite his encounters with law enforcement.

In *Weber*, the Ninth Circuit considered expert opinion in an affidavit regarding the proclivities of pedophiles. *Id.* at 1341. The affidavit recited the expert's belief that a pedophile "typically" uses sexually explicit materials to show children, pedophiles "often" take photographs of their victims, and that pedophiles do not destroy photographs but retain them for "many years." *Id.* The *Weber* Court found that the expert testimony was "foundationless." *Id.* at 1345. The expert opinion "consisted of rambling boilerplate recitations designed to meet all law enforcement needs" and "was not drafted with the facts of this case or this particular defendant in mind." *Id.* There was no evidence that the defendant was a child molester and the expert testimony did not establish what was required to be a "collector" of child pornography. *Id.* The Ninth Circuit stated that had the affiant "taken the time and conscientiously drafted an affidavit tailored to what he knew about [defendant] rather than submitting an affidavit describing generally information about different types of perverts who commit sex crimes against children," he would have realized that he did not have enough information to establish that the defendant "was one of the 'types' described or possessed any of the habits ascribed to such types." *Id.* The *Weber* Court thus found that such a "blunderbuss warrant" was unsupported by probable cause. *Id.*

The *Weber* Court also distinguished its case from another Ninth Circuit case, *United States v. Rabe*, 848 F.2d 994 (9th Cir. 1988). The *Weber* Court concluded that *Rabe* was dissimilar because in *Rabe* there was concrete evidence that the defendant had pornography in his home shortly before the warrant was executed, there was

expert testimony in the affidavit which addressed the facts of the defendant's case and specifically concluded based on those facts that the defendant was a pedophile, and there was enough information in the defendant's file to make a judgment as to whether the defendant fit the profile of a pedophile.  *Weber*, 923 F.2d at 1345-36.

In *United States v. Long*, 42 F.3d 1389 (6th Cir. 1994), the Sixth Circuit stated that the "critical factor" in *Weber* was that the affiant had failed to demonstrate that the defendant was either a "pedophile" or a "child pornography collector."  *Id.* at 10. The *Weber* affidavit asserted that pedophiles or child pornography collectors typically possess child pornography in such places as their homes, but the *Weber* affiant "failed to show that the defendant was the *type* of person who typically possessed child pornography at places such as his home."  *Id.* (emphasis in original).  The *Long* Court distinguished its case because the affiant had shown the defendant had a sexual interest in children and therefore "demonstrated that defendant was the *type* of person who typically possessed child pornography at places such as his home."  *Id.* (emphasis in original).  *See also United States v. Prideaux-Wentz*, 543 F.3d 954, 961 (7th Cir. 2008) (because the warrant connected defendant to several email accounts responsible for uploading or possessing child pornography, "there were enough specifics to suggest [defendant] might be a collector of child pornography," "despite the general, boilerplate language contained within the warrant affidavit"); *United States v. Rugh*, 968 F.2d 750, 754 (8th Cir. 1992) (distinguishing *Weber* and finding evidence that defendant abused his son since he was five years old and claimed to operate a nationwide child pornography ring was enough to support the conclusion

that defendant was a pedophile, and therefore expert opinion as to the proclivities of pedophiles was relevant).

Here, the Court concludes the Bourke Report is akin to the one in *Weber* because the report fails to identify Mr. Karun as the "type of person" who keeps trophies. The Bourke Report is a markedly unconventional expert report. A typical expert report recites the information the expert reviewed in order to come to the expert opinions. Here, apart from noting that the request came from Lieutenant Weisgerber and stating Kathleen Flynn's name, there is no suggestion that Dr. Bourke was issuing a report specific to this case or expressing expert opinions about Mr. Karun and whether he fit within these broad theories of aberrant psychology. Indeed, Dr. Bourke never mentions Mr. Karun's name. In fact, as Lieutenant Weisgerber acknowledges, in the space for date of birth for "Subject," Dr. Bourke miscites Kathleen Flynn's or Marc Karun's date of birth, depending whom he is referring to by "Subject." *Bourke Report* at 1; *Weisgerber Aff.* ¶ 85.

The Weisgerber Affidavit states that Dr. Bourke "review[ed] numerous case documents and case reports from Marc Karun's convictions." *Weisgerber Aff.* ¶ 85. The Court accepts Lieutenant Weisgerber's statement that he "provided" Dr. Bourke with these materials but absent some other proof in the documentation—and there is none—the Court is dubious about the foundation for Lieutenant Weisgerber's statement that Dr. Bourke actually reviewed those records. Absent Dr. Bourke's confirmation that he reviewed the material that Lieutenant Weisgerber provided, the

best Lieutenant Weisgerber could properly state is that he provided the material to Dr. Bourke, not what Dr. Bourke did when he received it.

Rather than express an expert opinion as to the case or Mr. Karun, Dr. Bourke has provided a general textbook review of what the field of forensic psychology knows about trophy keeping among serial rapists and murderers.  Dr. Bourke makes the observation that "[a] subset of offenders, including some serial rapists and murderers, take and may keep items that belonged to, were worn by, or are somehow connected to their victims."  *Bourke Report* at 1.  The Bourke Report never fully defines this "subset."  Dr. Bourke states that the subset includes "some serial rapists and murderers" and says "[o]ffenders who kill in a particularly 'intimate' manner (e.g., strangulation), or who murder their victims after they have sexually assaulted them" and "offenders who engage in serious acts of violence including serial rape and homicide" are "more likely" to take trophies.  *Bourke Report* at 1-3.  Apart from this general exposition on trophy keeping, Dr. Bourke never actually offers an expert opinion in his report.  The Bourke Report is more like a general guide for law enforcement education than an expert report tailored to the facts in this investigation.

Accepting that the subset is some group of serial rapists and murderers who keep trophies, there is little to no evidence that Mr. Karun falls within the subset. The Government argues that the Weisgerber Affidavit "describ[es] in detail a substantial basis on which the judge issuing the warrant could determine that Marc Karun was, in fact, not just a serial rapist, but a serial rapist who used similar

techniques in each of his attacks." *Gov't's Opp'n* at 16. The Weisgerber Affidavit recounts several sexual assaults and attempted sexual assaults, but the only indication that Mr. Karun ever took trophies from his victims is a victim statement from a January 1986 attack that said "[Mr. Karun] stated he was going to take the wire and hang it up" and the fact that police never found the ligatures used in the May 1988 attack. There is no evidence that Mr. Karun ever took clothing or jewelry from a victim. The evidence is clear that Mr. Karun is a serial rapist and his crimes are abhorrent, but because the psychological analysis is not specific to Mr. Karun, the Court cannot conclude that he falls within the "subset of offenders" that keep trophies.

Moreover, the Bourke Report never mentions the most obvious issue the search warrant presents: the passage of thirty-three years from the sexual assault and murder of Kathleen Flynn. To the extent Dr. Bourke alludes to the passage of time, he writes the "offenders are quite prolific, and the intense excitement that they experience from the behavior makes them unlikely to stop on their own." *Bourke Report* at 1. But this record contains no evidence of any sexual assault or other violence by Mr. Karun after June 1988—a period of over thirty years. According to the record, he was last released from prison in Connecticut on June 27, 2000, and therefore the search warrant was issued just shy of nineteen years from the date of his last incarceration. Thus, contrary to what Dr. Bourke predicted, Mr. Karun has apparently stopped on his own.

In fact, the Weisgerber Affidavit's description of Mr. Karun's conduct effectively ends on June 27, 2000, when the Connecticut State Prison system released Mr. Karun from his last period of incarceration. Other than knowing that Mr. Karun moved to Stetson, Maine at some point between June 27, 2000 and June 11, 2019, the date of the Weisgerber Affidavit, there is no information at all about Mr. Karun during this nineteen-year interval. Specifically, there is no evidence in this record that Mr. Karun was arrested or convicted of any crimes between 2000 and 2019.[8] If so, this means that Mr. Karun's last arrest was on July 22, 1996 for a burglary and larceny for which he was convicted and sentenced on April 22, 1997 to two years of incarceration, *Pretrial Services Report* at 3, and his last sexual offense was on June 17, 1988. *Weisgerber Aff.* ¶ 30. Furthermore, the affidavit and documentation contain no information about whether Mr. Karun was on state probation during any of this nineteen-year period and if so, how he performed on probation, where he was physically, whether he worked, and when he moved to Maine.

As just noted, this nineteen-year period of apparent quiescence is in stark contrast to the extraordinarily reckless nature of Mr. Karun's prior sexual crimes. The first in January 1986 involved as a victim someone who knew Mr. Karun from school. The second in September 1986 is the highly risky kidnapping, sexual assault and murder of Kathleen Flynn, presumably grabbing her while she was on a public pathway as she walked home from school. The third in April 1988 is the tying up and

---

[8]     This would be consistent with the Pretrial Services Report dated November 20, 2019, but this information does not appear in the Weisgerber Affidavit and documentation. *See Pretrial Services Report* at 3.

sexual assault of the sixteen-year-old girl who knew Mr. Karun and had visited him in his apartment before the incident. The fourth in May 1988 is his nighttime entrance into an apartment that he had just vacated with the deadbolt lock for which he retained the key to sexually assault the new tenant. The fifth in May 1988 is his picking up a woman walking along the street in Norwalk, threatening her with a knife, and ordering her to strip as he sped along I-95 at a high rate of speed. The sixth in June 1988 is his lying-in-wait in a residential area of New Canaan, Connecticut, grabbing the victim and attempting to pull her into his vehicle, being interrupted by two other persons walking in the area. This string of gender-based assaults from January 1986 through June 1988 betray an unusual brazenness and carelessness that suggest Mr. Karun was barely in control of himself during this two-year interval. Yet, once he is released from prison on June 27, 2000, there is no suggestion that he engaged in any such public, rash, and notorious misconduct.[9]

Finally, the Weisgerber Affidavit and documentation do not respond to the obvious question about how Mr. Karun was able to secret Kathleen Flynn's clothing and the ligature for nearly thirty-three years. If Mr. Karun retained these items for decades, it is possible that he kept them in his residence, and it is also possible that he kept them somewhere else, such as in a storage locker or in a hole in the ground. The Weisgerber Affidavit recites Mr. Karun's arrest history and, based on some of

---

[9]   Assuming Dr. Bourke correctly hypothesized that Mr. Karun fits within a subset of perpetrators who commit serial crimes in a spasm of violence and retain mementos, Mr. Karun would seem to fit within yet another subset who after a period of intense violence, cease committing brazen crimes. There is no mention in the Bourke Report of this subset of a subset because Dr. Bourke is not addressing Mr. Karun's individual case.

these incidents, it seems likely that he was arrested and jailed without prior notice. If so, there is no indication of how he would have been able to hide these items in his residence when he was periodically unexpectedly removed and absent from the residence sometimes for extended periods.  An alternative would be that he kept these criminal mementos in a place away from his residence.  If so, a search of his residence would not have discovered them.

In 1993, Judge Torruella, addressing a somewhat similar case, wrote in concurrence:

> I concede that the affidavit showed the ongoing utility of child pornography to collectors and pedophiles, discussing how such individuals keep their dross for long periods of time.  Standing alone, however, this information does not justify the conclusion that appellant kept the materials throughout sixteen years and two relocations.  The affidavit did not define collector and pedophile, or characterize appellant as a member of either class.

*United States v. Ricciardelli*, 998 F.2d 8, 18 (1st Cir. 1993) (Torruella, J., concurring).

Although not cited by the parties, *State v. Multaler*, 2002 WI 35, 252 Wis. 2d 54, 643 N.W. 2d 437, a factually similar case in Wisconsin, is instructive.  In *Multaler*, police found pornographic materials in the defendant's house while executing a search warrant for evidence implicating him in a series of homicides.  *Id.* ¶ 1.  As a result, the defendant was convicted of possession of child pornography.  *Id.*  The defendant challenged his conviction, arguing "the affidavit fails to provide probable cause to believe that evidence of the murders would remain in his house more than 20 years later."  *Id.* ¶ 10.

The Wisconsin Supreme Court disagreed and found that the affidavit did establish probable cause.   The *Multaler* Court concluded that "the affidavit documented particular instances in which Multaler collected or sought to collect the types of mementos serial killers are known to collect and retain, including instances in which such items were observed in his possession." *Id.* ¶ 30.   In particular, the Court noted the defendant's ex-girlfriend told investigators that he kept an album containing pictures of females and newspaper articles about missing females, and she identified an article detailing the discovery of the body of one of the murder victims as possibly being an article in his album. *Id.* ¶ 28.   She also observed one of his scrap books contained an article about a fifth murder to which defendant may have been linked. *Id.*   The *Multaler* Court found that "[t]ethered to [the investigator's] research and expertise, these facts, along with other particular instances of Multaler's behaviors, established the reasonable inference that he would be likely to retain the mementos more than 20 years after the murders." *Id.* ¶ 32.   Regarding the twenty year gap in time, the *Multaler* Court noted that the defendant had lived at the same residence for over twenty years, so "assuming that Multaler retained mementos of his killings, the warrant judge had no reason to infer that they would be located anywhere other than in Multaler's house." *Id.* ¶ 33.

The *Multaler* Court noted, however, that "every probable cause determination must be made on a case-by-case basis, looking at the totality of the circumstances." *Id.* ¶ 34.   Indeed, "[e]ven when police suspect an individual is a serial killer, that will not always yield probable cause to search the individual's home." *Id.*   The Court

emphasized that its case involved "unusual facts" and "particular circumstances." *Id.*
While the *Multaler* Court ultimately found "the chain of probable cause here is crafted
of many sturdy links," it noted that "[i]n another case with different facts, the chain
may not be so sturdy." *Id.*

Mr. Karun's case is indeed another case with different facts, and the chain is
not so sturdy. Unlike *Multaler*, there were no prior documented instances of
Mr. Karun retaining mementos. The period of thirty-three years is significantly
longer than the twenty years in *Multaler* and, perhaps most importantly, Mr. Karun
moved six times and spent significant time in prison. The Government argues that
"[i]t does not strain credulity to believe that a person could maintain possession of
such items through several moves and even through stints in prison," but whether
something strains credulity is not the probable cause standard. *Gov't's Opp'n* at 21.
While the Bourke Report states that it is "extremely important to look for [missing
items] in the property of suspects (e.g., during the execution of any search warrant),"
*Bourke Report* at 4, the police must first have probable cause.[10]

---

[10]    The parties also argue the related issue of staleness. Mr. Karun contends that the evidence
that he took trophies from Kathleen Flynn and others is "stale." *Def.'s Mot.* at 32. He contends that
"[w]ithout more recent corroboration, the passage of 33 years irreversibly diminished the probability
that evidence of Ms. Flynn's death would be found at the home of Mr. Karun." *Id.* at 35. The First
Circuit explained that "[i]nformation contained in an affidavit is stale if it established probable cause
at some point in the past but does not support probable cause at the time of the warrant's issuance."
*United States v. McLellan*, 792 F.3d 200, 210 (1st Cir. 2015).
        A staleness analysis would be relevant here if there was evidence that the items once existed
in Mr. Karun's residence and the police sought a warrant based on that old information. Because there
is no direct evidence that Mr. Karun ever had these items, however, a staleness argument is not exactly
on point. Nevertheless, as already explained, the Court notes the fact that thirty-three years have
passed since Mr. Karun allegedly murdered Kathleen Flynn and took the described items makes it
less probable that he retained the items after all this time, even assuming he once possessed them.

### d.   Conclusion

"Viewed as a whole and from an objective vantage," the Court concludes that there was not a "fair probability" for the Connecticut and Maine judges to believe the ligatures, earring, bra, and underwear were located in Mr. Karun's Maine residence. *See Weber*, 923 F.2d at 1345 ("Each of these inferences standing alone may be reasonable.   But with each succeeding inference, the last reached is less and less likely to be true.   Virtual certainty becomes probability, which merges into possibility, which fades into chance").   To accept the Government's conclusion would allow the police to search the home of any serial rapist without expert opinion specific to him placing him within the specific subset of offenders who collect and keep trophies. There was at best a possibility—not probability—that the items were located at Mr. Karun's home.   Judges may not issue warrants based on mere possibilities and thus the warrant fails the Fourth Amendment's protections.

### 3.   Documentary Evidence

The warrant also describes the following pieces of media to be seized from Mr. Karun's Stetson residence:

> [I]mages of the earring, underwear or bra of Kathleen Flynn to include film and digital; newspaper articles/clippings relating to the homicide of Kathleen Flynn or any of the other sexual assaults committed by Marc Karun; electronic devices capable of connecting to the Internet to conduct searches relating to the Kathleen Flynn homicide or any of the other sexual assaults committed by Karun to include Smartphones, Tablets, Laptop computers and Desktop computers; any logs, journals or diaries relating to the sexual assault and homicide of Kathleen Flynn or any of Marc Karun's other sexual assault victims.

*June 11 Maine Warrant* at 2.  Like the physical items, the Court concludes that the Weisgerber Affidavit and Bourke Report fail to provide a sufficient basis for finding probable cause that the described documentary evidence existed at Mr. Karun's home.

The Government asserts that the documentary evidence was based on probable cause because the Bourke Report "describes keeping newspaper clippings as well as journals and personal letters relating to past crimes." *Gov't's Opp'n* at 19.  Assuming Mr. Karun killed Ms. Flynn, the sole reason for believing such documentary evidence existed is the Bourke Report.  The Bourke Report only references such documentary evidence twice.  First, the Bourke Report quotes retired FBI Agent and profiler John Douglas who said, "Keeping some memento—a lock of hair, jewelry, newspaper clips of the crimes—helps prolong, even nourish, [the killers'] fantasy of the crime.  In my research, I've seen this happen again and again." *Bourke Report* at 3.  The second reference is regarding pedophiles, where the Bourke Report quotes former FBI Special Agent Ken Lanning, who said, "[Pedophiles] typically collect books, magazines, articles, newspapers, photographs, negatives, slides, movies, albums, drawings, audiotapes, videotapes and equipment, personal letters, diaries, clothing, sexual aids, souvenirs, toys, games, lists, paintings, ledgers, photographic equipment, etc. – all relating to children in a sexual, scientific, or social way." *Id.* at 4.

The Court concludes that these two references are not enough to establish probable cause.  Like the physical evidence, the probability that documentary evidence existed in Mr. Karun's home relies on a chain of unwarranted inferences,

and like the physical evidence, the Bourke Report fails to establish that Mr. Karun falls within a subset of offenders that collects and keeps trophies from his victims. The Bourke Report is not specific to Mr. Karun and the Weisgerber Affidavit provides no basis to believe that Mr. Karun took pictures of Ms. Flynn's earring, bra, or underwear, that he kept any newspaper clippings, searched for Ms. Flynn or other victims online, or that he kept logs, journals, or diaries of the crimes. Even if such items once existed, it is improbable that they existed at Mr. Karun's home in Stetson, Maine thirty-three years after the crime, including at least six moves and four periods in prison, some extended.

The other statement fails to establish probable cause because it was made in the context of pedophiles and there is no evidence, apart from the sexual assault and murder of Kathleen Flynn, that Mr. Karun is a pedophile. Although it asserts that whether Mr. Karun is a pedophile "is not central to the case, and the issues raised by the defense do not turn upon it," the Government contends that the rape and murder of Ms. Flynn alone is enough to show he has a sexual interest in children, and points to his rape of a sixteen year old girl as further evidence. *Gov't's Opp'n* at 21 n.7.

The Court is not persuaded. A review of Mr. Karun's prior victims—females aged sixteen, eighteen, twenty-three, and forty-one—does not establish a sexual interest in children. This is particularly true because of Mr. Karun's age when compared with the ages of his victims. Mr. Karun was twenty when the January 1986 incident took place involving the eighteen-year-old victim. He was twenty-two when each of the remaining incidents in 1988 took place involving the sixteen,

twenty-two and forty-one-year-old females.  Although the Court's assumption that he sexually assaulted an eleven-year-old girl when he was twenty-one is an indication of pedophilia, it may also be true that Kathleen Flynn was simply a victim of opportunity for Mr. Karun, just as appears to be the case with the forty-one-year-old in June 1988 in New Canaan.  Without more, the Court would need expert testimony about whether Mr. Karun fits the definition of pedophilia and there is none in the Bourke Report.

Even assuming Mr. Karun kidnapped, raped and murdered Kathleen Flynn, which this Court has, this one incident does not establish his pedophilic interest in children or his status as a collector who would possess certain newspaper articles, diaries, or other media.  There is no suggestion in the affidavit that such documentary evidence ever existed or would be located at Mr. Karun's home.  *See United States v. Griffith*, 867 F.3d 1265, 1272 (D.C. Cir. 2017) (concluding that a warrant application that described "the seizure of any documents, newspaper articles, photographs, or other information relating to the crime" lacked probable cause because the affiant "suggested no reason whatsoever to expect the presence of" the described documents); *United States v. Zimmerman*, 277 F.3d 426, 433 (3d Cir. 2002) (finding an affidavit that recounted various incidents in which defendant allegedly sexually accosted students and recounted one mention of adult pornography failed to establish probable cause because "there was absolutely no information in the affidavit or anywhere else indicating that child pornography was—or ever had been—located [in the defendant's home]").  As the Bourke Report itself states, "[o]f course, not all child murderers are

pedophiles, and not all take mementos from their crimes." *Bourke Report* at 4. Without any further analysis of whether Mr. Karun is a pedophile or otherwise fits into a subset of serial rapists who keep mementos, the Court concludes there was no probable cause to believe the described documentary evidence existed in Mr. Karun's residence.

## C.    The Good Faith Exception

The Government argues that even if the Court deems the warrant unsupported by probable cause, the police relied on it in good faith. *Gov't's Opp'n* at 22.  The Government asserts "[t]his was not a fast-and-loose attempt to slip one by the magistrate" but rather was "a lengthy and deliberate statement of the evidence, including the lack of evidence on certain points." *Id.*

### 1.    Legal Standard

It is "apodictic" that "[e]ven if a warrant issues upon an insufficient showing of probable cause, suppression may be inappropriate if the officers involved have exhibited objective good faith." *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017) (quoting *United States v. Floyd*, 740 F.3d 22, 32 (1st Cir. 2014)).  Known as the *Leon* good faith exception, in 1984, the Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007) (referring to the "*Leon* good faith exception").  "This is particularly true, we believe, when an officer acting with

objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920.  This is consistent with the First Circuit's guidance that "[t]he exclusionary rule should be limited to those situations where its remedial objectives are best served, i.e., to deter illegal police conduct, not mistakes by judges and magistrates." *Bonner*, 808 F.2d at 867.  The good faith inquiry should be made on a "case-by-case" basis. *Vigeant*, 176 F.3d at 572.

The First Circuit highlighted four circumstances where suppression remains appropriate: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role"; (3) "[w]here the executing officer relies on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (4) "where . . . a warrant . . . is 'so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" *United States v. Levin*, 874 F.3d 316, 322 (1st Cir. 2017) (citing *Leon*, 468 U.S. at 923; *Woodbury*, 511 F.3d at 99).

The Court finds that none of the described situations regarding absence of good faith is present here.  There is no suggestion that the warrant-issuing judges wholly abandoned their judicial roles and as the Court previously concluded, the warrant was sufficiently particular.  The Court turns to the first and third circumstances.

56

### 2.    Falsity

Mr. Karun argues that the Weisgerber Affidavit contains misleading statements material to probable cause made with a reckless disregard for the truth. *Def.'s Mot.* at 37; *Def's Reply* at 16-17.  Specifically, he contends the assertion that "Karun did not hang the wire up in the car so he may have been referring to another location as a piece of memorabilia" was "speculative" and was presented with reckless disregard for the truth.  *Def.'s Mot.* at 37.  He also argues that the statement that "Karun removed the neck ligature from the victim prior to leaving the scene and took it with him" was a statement of fact made with reckless disregard for the truth.  *Id.* at 38.  Mr. Karun never explicitly asks for a veracity hearing but cites law for when such a hearing is required.  *See id.* at 19.  The Court thus considers whether a veracity hearing is required and whether portions of the affidavit contain statements that are intentionally false or made with reckless disregard for the truth, defeating good faith. *See Coombs*, 857 F.3d at 447 ("[R]ecklessness can defeat a claim of good faith").

### a.    *Franks* Hearing:  The Legal Standards

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a defendant is entitled to a hearing to challenge the veracity of a warrant affidavit where (1) "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) "if the allegedly false statement is necessary to the finding of probable cause."  *Id.* at 155-56.  "Failure to make a showing on either element dooms a party's hearing request."  *United States*

*v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012).  "Allegations of negligence or innocent mistake" will not suffice.  *Franks*, 438 U.S. at 171.  The "challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  *Id.*

### b.   *Franks* Hearing and Marc Karun's Motion

The Court concludes Mr. Karun has not made a "substantial preliminary showing" that any false statements were made.  *Franks*, 438 U.S. at 155-56.  The Court agrees with the Government that the first statement Mr. Karun objects to is a reasonable inference and was not presented as a statement of fact.  The Weisgerber Affidavit did not state that Mr. Karun hung up the wire as memorabilia but rather that he "may have."  The Court accepts as true Lieutenant Weisgerber's "may have" statement because it is true that Mr. Karun may have done so.  The issuing judges were free to make their own conclusions regarding the collection of trophies, and Mr. Karun has not made a substantial showing that such statement was false or misleading.

There is similarly no need for a *Franks* hearing on the second statement because it was also a permissible inference.  Mr. Karun is correct that there is no direct evidence that after the May 1988 assault he removed the ligature from the victim and took it with him.  The Weisgerber Affidavit shows, however, that the victim did not remove the ligature from her own neck, and, unlike the shoelaces that Mr. Karun used to tie the victim's hands, there is no evidence that the ligature was

58

found at the crime scene.  As Mr. Karun used a ligature during his May 1988 sexual assault, and there is no evidence that the ligature was in the apartment after the assault, it is reasonable to infer that Mr. Karun took the ligature with him. Mr. Karun has not even alleged this statement is false, let alone made a substantial showing that it was made with reckless disregard for the truth.  Regardless, both statements fail the second prong of the *Franks* test because they are not necessary to a finding of probable cause.  Even if the statements are omitted, the judges still had all the facts to make the inferences for themselves, and so exclusion would not change any probable cause analysis.

The Court rejects Mr. Karun's demand for a *Franks* hearing because he failed to meet the legal standards for such a hearing.

### 3. So Lacking in Indicia of Probable Cause as to Render Official Belief in Its Existence Entirely Unreasonable

Mr. Karun also contends that, like in *Weber*, the affidavit becomes "bare bones" when "stripped of the fat" of "foundationless expert testimony," such that no reasonable officer could believe probable cause to exist.  *Def.'s Reply* at 15 (quoting *Weber*, 923 F.2d at 1346).

In a 2013 case, *United States v. Needham*, 718 F.3d 1190 (9th Cir. 2013), the Ninth Circuit considered a similar case to *Weber*, involving a warrant to search a defendant's home for child pornography.  The defendant argued that the affiant's assertions regarding his "unnatural sexual interest in children" and that "these people collect sexually explicit material of children" were inadequate to support probable cause and the good faith exception should not apply.  *Id.* at 1193-94.  He

argued that after *Weber*, no officer could have reasonably believed that the warrant to search his apartment was supported by probable cause. *Id.* at 1195.

The *Needham* Court agreed the search warrant lacked probable cause but rejected defendant's good faith argument by looking to another case in which the Ninth Circuit examined the facts of *Weber* and concluded that "[i]f probable cause did not exist in *Weber*, it cannot exist here." *Id.* (citing *Dougherty v. City of Covina*, 654 F.3d 892, 898 (9th Cir. 2011)).[11]   Nevertheless, the *Dougherty* Court concluded that at that time, the law was not settled concerning "the question of whether evidence of child molestation, alone, creates probable cause for a search warrant for child pornography." *Id.* (citing *Dougherty*, 654 F.3d at 899).   The *Needham* Court, therefore, concluded that "[b]ecause we found sufficient ambiguity in our precedent, despite *Weber*, to confer a grant of qualified immunity in *Dougherty* in 2011, we are foreclosed from holding that *Weber* rendered good faith reliance on the warrant in this case impossible in 2010." *Id.* at 1196.

Here, the Court finds that the warrant lacked probable cause, but this does not mean the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Levin*, 874 F.3d at 322.   Just as the Ninth Circuit in *Needham* decided that precedent regarding probable cause in child

---

[11]    *Dougherty v. City of Covina* was an action by a suspected child molester against the city, police officer, and chief of police alleging violation of his Fourth Amendment rights in connection with a warrant issued to search his home computer for child pornography.   The affidavit included only a three-year-old allegation of attempted molestation by one student and more recent allegations of inappropriate touching of and looking at students. *Id.* at 898.   Based on those facts, the court found probable cause did not exist. *Id.* at 899.   However, the court granted the officer qualified immunity because the law "had not been clearly established regarding whether allegations of sexual misconduct or molestation at a place of work provide probable cause to search a residence for child pornography in the absence of an explanation tying together the two crimes." *Id.* at 900.

pornography was sufficiently ambiguous, this Court concludes that there is no clear precedent addressing whether being a serial rapist or killing in an intimate manner alone creates probable cause for a search warrant to seize "trophies" from the victim.

The Court has not found—and neither Mr. Karun nor the Government has identified—any case which has rejected reliance on expert opinion similar to that of Dr. Bourke to support a finding of probable cause.  The field of psychological profiling is complex.  An objectively reasonable officer could read the Weisgerber Affidavit and the Bourke Report and conclude there was probable cause that the items existed in Mr. Karun's home.  While the Court finds support from *Weber* in its probable cause conclusion, *Weber*'s holding from 1990 regarding child pornography does not negate good faith reliance in this case.

Furthermore, the record shows that the warrant was approved by not one but two judges—one in Connecticut and one in Maine.  *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 308 (S.D.N.Y. 2018) ("[T]he warrants were reviewed and approved by two different magistrate judges acting independently, which provides a clear presumption of validity").  The warrant application included a thirty-two-page affidavit and expert opinion from Dr. Michael Bourke, Chief of the Behavioral Analysis Unit at the U.S. Marshals Service in Washington, D.C.  While the parties cited cases involving collectors of child pornography, the parties have not identified, nor has the Court found, any instance where a court found expert opinion like the Bourke Report to be invalid.  The Bourke Report sets down general and apparently uncontested principles of forensic psychology and the Weisgerber

Affidavit sets out the details of the law enforcement investigation, leaving for the judge or magistrate to determine whether the facts in the affidavit are sufficient to fit within the general principles in the report. While the Court has determined that this effectively requires the reviewing judge to act beyond the proper range of judicial expertise and assume the role properly assigned to an expert, a reviewing judge is allowed to draw logical inferences from the record and the line between a permissible and impermissible inference is too fine to conclude that the *Leon* standard of good faith was breached in this case.

To recapitulate, the Weisgerber Affidavit and the Bourke Report contain the following:

1) That Mr. Karun is likely the person who kidnapped, sexually assaulted and murdered eleven-year-old Kathleen Flynn in September 1986 in Norwalk, Connecticut;

2) That Mr. Karun used a ligature to choke and control Ms. Flynn by applying pressure around her neck before sexually assaulting and killing her;

3) That despite an intensive search of the area near where Ms. Flynn's body was found, investigators were not able to find and never found the ligature Mr. Karun used around Ms. Flynn's neck, or a gold heart-shaped earring, a bra, and underwear she was wearing the day of the incident;

4)    That Mr. Karun is likely a serial rapist, having been involved between 1986 and 1988 in five sexual assaults or attempted sexual assaults;

5)    That Mr. Karun's criminal history included convictions for a January 1986 sexual assault, an April 1988 sexual assault, a May 1988 threatening, a June 1988 sexual assault and a July 1996 burglary;

6)    That Mr. Karun was incarcerated in Connecticut State Prison for various periods between May 23, 1988 and June 27, 2000 for these convictions;

7)    That on March 28, 2018, Mr. Karun was positively identified as the offender in a previously unsolved sexual assault from May 1988 in Derby, Connecticut;

8)    That Mr. Karun used a particular modus operandi in four of these incidents, namely choking the victim;

9)    That Mr. Karun used a ligature in three of these sexual assaults;

10)   That after the first sexual assault, referring to a ligature he had used to choke and control her, he told the victim he was going to "hang it up";

11)   That a reasonable interpretation of "hang it up" is that he was going to retain it and memorialize it;

12) That he likely brought a ligature to the scene of one of the other sexual assaults that he used to choke and control the victim and likely removed the ligature after the sexual assault;

13) That some serial rapists retain mementos of their crimes, such as the victim's clothing or items intimately associated with the victim and the crime; and

14) That based on the "hang it up" statement, his repetitious use of ligatures in perpetrating multiple sexual assaults, and the absence of ligatures from crime scenes, Mr. Karun may have fit within this subset of serial rapists who retain memorials of their crimes.

The issuing judges were entitled to weigh each of these documented assertions in making their determinations as to whether probable cause existed for a warrant authorizing the search and seizure of Mr. Karun's residence.  Furthermore, it is only after an intensive review of the Weisgerber Affidavit and Bourke Report that gaps in the chain of inferences are revealed—gaps that may not have been apparent to Lieutenant Weisgerber, to the issuing judges, or to the executing officers.  Nor is there any suggestion in this record that the gaps in the application for a search warrant were the result of "systemic or recurrent police misconduct" that would be deterred if the seized evidence were suppressed.  *Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016). To the contrary, the Connecticut and Maine judges issued the search warrants based

on diligent and detailed police work in an attempt to solve a decades old, but unspeakably tragic case.

This situation is similar to the one in *Levin*, where the First Circuit explained "[t]o the extent that a mistake was made in issuing the warrant, it was made by the . . . judge[s], not by the executing officers, and the executing officers had no reason to suppose that a mistake had been made and the warrant was invalid." *Levin*, 874 F.3d at 323. With these principles in mind, the Court concludes that the executing officers acted "with an objectively 'reasonable good-faith belief' that their conduct [was] lawful." *Id.* at 322 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).

Finally, the *Levin* Court mentions the "great cost to society of suppressing the resulting evidence." *Levin*, 874 F.3d at 324. In doing so, the First Circuit echoed guidance from the United States Supreme Court. In 2006, in *Hudson v. Michigan*, 547 U.S. 586 (2006), the Supreme Court reflected on the "substantial social costs" of exclusion. *Id.* at 591 (quoting *Leon*, 468 U.S. at 907). The *Hudson* Court observed that the exclusionary rule sometimes has the effect of "setting the guilty free and the dangerous at large." *Id.* The Supreme Court noted the "rule's 'costly toll' upon truth-seeking and law enforcement objectives" presents "a high obstacle for those urging [its] application." *Id.* (quoting *Pennsylvania Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 364-65 (1998)). Accordingly, the Supreme Court has "held it to be applicable only 'where its remedial objectives are thought most efficaciously served.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). In other words, "where

its deterrence benefits outweigh its 'substantial societal costs.'"  *Id.* (quoting *Scott*, 524 U.S. at 363) (quoting *Leon*, 468 U.S. at 907)).

On these facts and applying these principles, the Court concludes that the searching officers' good faith reliance on the warrant outweighs the "great cost to society of suppressing the resulting evidence."  *Levin*, 874 F.3d at 324.

## IV.   CONCLUSION

The Court DENIES Marc Karun's Motion to Suppress (ECF No. 41).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of January, 2021